TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00032-CV






Texas Logos, L.P., Appellant


v.


Gregory R. Brinkmeyer, Individually; Hori-Zone Concepts, L.L.C.;

Centerline Supply, Inc.; Lonestar Logos & Signs, L.L.C.; Media Choice, L.L.C.; and

Quorum Media Group, L.L.C., Appellees






FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT

NO. 06-1022-C277, HONORABLE J. F. CLAWSON JR., JUDGE PRESIDING





O P I N I O N


 Since the Texas Department of Transportation awarded its "logo sign contract" (1) to
a rival vendor, the vendor that had previously held the contract, Texas Logos, L.P., has filed
two separate lawsuits alleging that a TxDOT engineer involved in the procurement, in combination
with the winning vendor and others, had unlawfully skewed the procurement process so as to cause
Texas Logos to lose the contract. In its first suit, Texas Logos sued TxDOT in Travis County district
court seeking declaratory relief aimed ultimately at voiding the logo sign contract. The district court
dismissed the suit against TxDOT for lack of subject-matter jurisdiction. We affirmed, holding
principally that Texas Logos's declaratory claims seeking to invalidate an already executed contract
with the State were barred by sovereign immunity. See Texas Logos, L.P. v. Texas Dep't of Transp.,
241 S.W.3d 105, 115-23 (Tex. App.--Austin 2007, no pet.) (Texas Logos I).

 This appeal relates to Texas Logos's second suit. After it filed its first suit, Texas
Logos brought an action in Williamson County against: (1) the now-former TxDOT engineer,
Gregory Brinkmeyer; (2) a consulting company that Brinkmeyer had formed, Hori-Zone Concepts,
L.L.C.; (3) the vendor that won the logo sign contract, Media Choice, L.LC., and its affiliates,
(4) Quorum Media Group, L.L.C. and (5) LoneStar Logos & Signs, L.L.C. (collectively, the Media
Choice Defendants); and (6) Centerline Supply, Inc., a subcontractor who allegedly did business with
both Brinkmeyer and the Media Choice Defendants. Texas Logos asserted common-law tort theories
against the defendants and sought monetary damages and injunctive relief. The district court
dismissed the suit for want of subject-matter jurisdiction. Because we conclude that the Williamson
County district court possessed subject-matter jurisdiction over Texas Logos's common-law tort
damage claims against private parties, we reverse its judgment dismissing those claims and remand
for further proceedings.


STANDARD AND SCOPE OF REVIEW

 The subject-matter jurisdiction of a trial court may be challenged through a plea to
the jurisdiction. See Texas Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 225-26
(Tex. 2004); Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 554 (Tex. 2000); Hendee v. Dewhurst,
228 S.W.3d 354, 366 (Tex. App.--Austin 2007, pet. denied). The determination of whether a trial
court has subject-matter jurisdiction begins with the pleadings. See Miranda, 133 S.W.3d at 226. 
The pleader has the initial burden of alleging facts that affirmatively demonstrate the trial court's
jurisdiction to hear the cause. Id. (citing Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d
440, 446 (Tex. 1993)). Whether the pleader has met this burden is a question of law that we review
de novo. Id. We construe the pleadings liberally and look to the pleader's intent. Id.

 If the pleadings do not contain sufficient facts to affirmatively demonstrate the
trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the
issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend. 
Id. at 226-27. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the
jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. Id. at 227.

 When a plea to the jurisdiction challenges the existence of facts alleged by the pleader
to establish the trial court's subject-matter jurisdiction, the trial court must consider relevant
evidence submitted by the parties. Id. at 227 (citing Bland, 34 S.W.3d at 555); Hendee, 228 S.W.3d
at 366. Here, two pleas to the jurisdiction were filed by four of the six defendants. Neither plea
challenged the jurisdictional facts alleged by Texas Logos or attached controverting jurisdictional
evidence. Nor did any defendant introduce jurisdictional evidence at any hearings relating to the
pleas. Consequently, we assume the truth of the factual allegations contained in Texas Logos's
pleadings. Miranda, 133 S.W.3d at 226. The defendants' jurisdictional challenges, in other words,
are limited to disputing whether Texas Logos has pled facts that, if proven, would affirmatively
establish the district court's subject-matter jurisdiction.

 On the other hand, because Texas Logos attached jurisdictional evidence to its
petition, we may consider such evidence in resolving any jurisdictional challenges the defendants
have raised. Bland, 34 S.W.3d at 555 ("[A] court deciding a plea to the jurisdiction is not required
to look solely to the pleadings but may consider evidence and must do so when necessary to resolve
the jurisdictional issues raised.").


THE LOGO SIGN PROCUREMENT STATUTES

 Before turning to Texas Logos's pleadings and jurisdictional evidence, it is helpful
to note some relevant features of the statutes governing TxDOT's logo sign procurement process. (2) 
The legislature has charged TxDOT with contracting with third-party vendors to erect and maintain
"specific information logo signs," "major shopping area guide signs" and "tourist-oriented
directional signs." Tex. Transp. Code Ann. §§ 391.091(a), .0935(f), .099(d) (West 2007 & Supp.
2007). The legislature has prescribed certain terms that such contracts must contain, including
provisions for the charging of fees and remittance of at least ten percent to TxDOT. Id.
§§ 391.091(b), .0935(g), .099(e). It had also specified that, at least with regard to specific-information logo signs and major shopping area guide signs:


(b) The department may enter into a contract under this section by the method
that the department determines is the most advantageous for the state,
including competitive bids, competitive sealed proposals, and open market
contracts.


. . . . 



 (c) The department shall make a written award of a contract to the offeror
whose proposal offers the best value for the state. In determining the
best value for the state, the department may consider:


 (1) revenue provided to the department by the contractor;

 (2) fees to be charged eligible businesses or agricultural interests
for inclusion on the signs;

 (3) the quality of services offered;

 (4) the contractor's financial resources and ability to perform; and

 (5) any other factor the department considers relevant.


 (d) To the extent of any conflict, this section prevails over any other law
relating to the method of the purchasing of goods and services by the
department.

 

 (e) Subtitle D, Title 10, Government Code, and Chapter 223 [the
Purchasing Act] do not apply to purchases of goods and services
under this section.


Id. §§ 391.091(b), (c)-(e); cf. Texas Logos I, 241 S.W.3d at 116-19 (discussing parties' dispute over
whether the Purchasing Act, instead of the above standards, governed TxDOT's procurement of the
third category of logo signs, the tourist-oriented directional signs).

 As we observed in Texas Logos I, the legislature "has not specifically provided
a judicial review mechanism under the Purchasing Act or the transportation code" for
challenging TxDOT's logo sign contract award. 241 S.W.3d at 116. Consequently, the judiciary
lacks subject-matter jurisdiction to invalidate the award once it has been made. See,
e.g., Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc., 145 S.W.3d 170, 172
(Tex. 2004) ("In Texas, a person may obtain judicial review of an administrative action only if a
statute provides a right to judicial review, or the action adversely affects a vested property right or
otherwise violates a constitutional right."); Texas Logos I, 241 S.W.3d at 116 (observing that Texas
Logos conceded that it "possessed no vested property right in the award of the logo sign contract that
could support a claim to an inherent right of judicial review"); see also id. at 119-23 (holding that
sovereign immunity barred Texas Logos's declaratory claims seeking to void the logo sign contract).


THE RECORD

Pleadings and jurisdictional evidence (3)

 In its live petition, Texas Logos pled that after TxDOT issued a request for proposals
(RFP) for the logo sign contract in December 2005, Texas Logos "timely submitted a complete,
responsive proposal" that "met or exceeded all the published requirements of the RFP." "[S]everal
other companies" also submitted proposals, "including Media Choice and Quorum Media who
submitted a joint proposal." After TxDOT scored the submitted proposals, Texas Logos alleged, it
initially received the highest score, 98, while Media Choice tied for second with Corey Media,
achieving a score of only 93. These top three scorers were then invited to give oral presentations to
TxDOT regarding their proposals, which they did in March 2006. On May 12, 2006, TxDOT
awarded the logo sign contract to Media Choice. Texas Logos alleges that the final ranking
respective scores were Media Choice (79), Texas Logos (77), and Corey Media (70).

 Texas Logos attributes what it characterizes as its narrow loss to Media Choice to the
tortious acts of the defendants. Specifically, it alleges that "[p]rior to, or during, the procurement
process, Media Choice, Quorum Media, Greg Brinkmeyer and . . . others at TxDOT acting in concert
with him or Media Choice entered a conspiracy to ensure that Media Choice/Quorum Media received
the Logo Sign Contract and, thereby, depriving TEXAS LOGOS its right to participate in a
fair procurement free from conflicts of interest, cronyism, and fraud." This goal was advanced,
Texas Logos alleged, primarily through Brinkmeyer, "who directly managed the Logo Sign Program
for TxDOT for several years prior to and during the most recent solicitation and proposal process,"
"actively participated in the design and development of the RFP, the criteria under which proposals
would be evaluated by TxDOT, and the awarding of the Logo Sign Contract,"and served as a
member of TxDOT's six-member Logo Sign Evaluation Committee. In return, Texas Logos alleged,
Media Choice and/or Centerline Supply agreed to provide work for Brinkmeyer and a consulting
business he had recently formed, Hori-Zone. Texas Logos alleged:



 "[A]t some time during or before the Logo Sign Program bid solicitation and proposal
process, Defendant Brinkmeyer decided to resign his position at TxDOT and actively sought
employment in the private sector" and, before "leaving his position . . . formed Hori-Zone,
a privately-owned company whose expressed purpose was to 'help manufacturers . . .develop
new products, help gain state approvals . . . developing specification in the state format for
inclusion into projects.'"




 "Prior to the RFP for the Logo Sign Contract, Brinkmeyer informed TEXAS LOGOS about
employment opportunities he had pursued with another prospective contractor with the State,
which TEXAS LOGOS suspected was a veiled inquiry regarding employment by
Brinkmeyer. . . . Believing such discussions to be a prelude to an improper and unethical
request by Brinkmeyer for employment, TEXAS LOGOS declined to engage in any such
discussions with Brinkmeyer."

 "Upon information and belief, Defendant Brinkmeyer approached or was approached by
Defendants Media Choice, LoneStar [the successor to Media Choice and Quorum Media],
and/or Defendant Centerline Supply regarding employment opportunities after his departure
from TxDOT."

 "Thereafter, upon information and belief, Defendants Brinkmeyer, Media Choice, LoneStar,
and/or Centerline Supply agreed that in return for Brinkmeyer's assistance in obtaining the
Logo Sign Contract for Media Choice and/or providing other consideration, Media Choice
and/or Centerline Supply would provide work for Brinkmeyer after he left TxDOT. Based
on this or other agreements or understandings, Centerline entered the conspiracy alleged
herein."
 "Defendant Centerline Supply was recommended by Brinkmeyer to LoneStar as a
subcontractor. Centerline entered into an agreement with LoneStar to provide products
and/or services to LoneStar and to TxDOT."

 "While still employed at TxDOT, Brinkmeyer used his Department email account to solict
business from existing Department clients for himself and his new company, Hori-Zone. 
Brinkmeyer solicited a consulting position from Centerline Supply while at the same time
granting Centerline a specification variance for a fiberglass sign that was Centerline's
proprietary technology and from which Centerline stood to gain a substantial financial
benefit in the form of direct sales to TxDOT. . . . While still employed at TxDOT, during
Department hours and using Department equipment, Defendant Brinkmeyer performed
consulting work on Centerline Supply's behalf."



Texas Logos pled that in furtherance of this conspiracy, Brinkmeyer or others at TxDOT acting in
concert with him undertook numerous acts to skew the logo sign procurement process to Media
Choice's benefit and Texas Logos's detriment, including:



 "During the procurement, and in furtherance of the conspiracy, Brinkmeyer and/or others at
TxDOT, acting in concert with him or Media Choice, waived the requirement that Media
Choice/Quorum Media submit audited financial statements in response to the RFP. Media
Choice then submitted false and misleading unaudited financial statements." In support of
these allegations, Texas Logos attached the affidavit of Media Choice's chief financial
officer at the time the company submitted its proposal to TxDOT. She testified that the
financial statement the company submitted with its proposal was "materially inaccurate" in
several respects.

 Brinkmeyer deleted emails and other documents from his computer in violation of the
government code. Texas Logos pled "[o]n information and belief, when ultimately
discovered, these deleted emails and documents will further evidence Brinkmeyer's collusive
efforts with Defendants Media Choice, Quorum Media, LoneStar and/or Centerline
Supply . . . ."

 Defendant Brinkmeyer or others at TxDOT acting, in concert with Brinkmeyer or Media
Choice/Quorum Media were in contact with certain Media Choice/Quorum Media employees
during the bid solicitation and proposal process and provided Media Choice/Quorum Media
with material information regarding TEXAS LOGOS' proposal. Texas Logos attached an
affidavit from a former Media Choice employee to the effect that Media Choice personnel
had a phone conversation with some unidentified TxDOT employee immediately following
Texas Logos's oral presentation in the RFP process and that "Media Choice looked pretty
good compared to Texas Logos."
 "Through the acts and omissions of Defendant Brinkmeyer and/or those at TxDOT acting
in concert with him or Media Choice/Quorum Media, the procurement was materially flawed
because TxDOT":




 "used demonstrably inaccurate criteria in evaluating the fees receivable under the
proposals submitted by TEXAS LOGOS and Media Choice/Quorum Media."

 "accepted - in direct violation of its own rules - Media Choice/Quorum Media's
proposal despite Media Choice/Quorum Media's non-compliance with the RFP's
expressed requirements. . . ."

 "awarded a 'best value' procurement contract to Media Choice/Quorum Media with
incomplete information regarding the 'value' Media Choice/Quorum Media was
providing on the contract. . . ."

 "awarded a 'best value' procurement contract to Media Choice/Quorum Media over
TEXAS LOGOS despite substantially unfavorable differences between the
prospective revenues generated for the State of Texas and retained by [the vendors]
during the Contract term."

 "awarded a 'best value' procurement contract to Media Choice/Quorum Media over
TEXAS LOGOS despite the fact that TEXAS LOGOS' proposed return to TxDOT
is higher throughout the contract term than the amounts specified in the contract
awarded to Media Choice/Quorum Media . . . ."

 "awarded a 'best value' procurement contract to Media Choice/Quorum Media over
TEXAS LOGOS despite the fact TEXAS LOGOS offered . . . to provide to the State
a [higher] guaranteed minimum annual return. . . ."

 "awarded a 'best value' procurement contract to Media Choice/Quorum Media
despite the fact that Media Choice/Quorum Media failed to offer the minimum
required percentage of fees to the State of Texas . . . ."

 "awarded a 'best value' procurement contract to Media Choice/Quorum Media
despite the fact that Media Choice failed to provide audited financial
statements . . . ."

 awarded a 'best value' procurement contract to Media Choice/Quorum Media over
TEXAS LOGOS despite the fact TEXAS LOGOS offered lower costs to certain
businesses participating in the logo sign program . . . . "




 "Media Choice/Quorum Media knew or should have known that certain above-referenced
information supplied to TxDOT in support of its proposal was false or misleading and
material to TxDOT's evaluation of its proposal, and that TxDOT would rely upon this
information in making its decision to award the contract."

 "Defendant Brinkmeyer knew or should have known that certain information provided by
Media Choice/Quorum Media in support of its proposal, or omitted from its bid proposal,
was false or misleading and material to the Evaluation Committee's and TxDOT's decision
in awarding the Contract. . . . Brinkmeyer and/or others at TxDOT acting in concert with him
and/or Media Choice/Quorum Media used his influence within TxDOT and as a member of
the Evaluation Committee to push through Media Choice/Quorum Media's incomplete and
deficient proposal . . . to ensure that Media Choice/Quorum Media was awarded the Logo
Sign Contract."

 "Defendants' acts as alleged allowed Media Choice/Quorum Media to unlawfully participate
in the Logo Sign Contract procurement and deprived TEXAS LOGOS of the opportunity to
have its proposal evaluated objectively and in compliance with the competitive, best value
procurement required by statute."



 Based on these factual allegations, Texas Logos asserted claims for actual and
exemplary damages under theories of fraud (against Brinkmeyer), civil conspiracy (against all
defendants), and tortious interference with a business relationship (against all defendants). It also
asserted a claim for declaratory judgments that the defendants had committed these torts. (4) Texas
Logos also sought injunctive relief to stay the Media Choice Defendants' performance of the
logo sign contract--scheduled to begin on January 1, 2007--until conclusion of the trial on
the merits, plus an injunction against "any further destruction of records or evidence relevant to
the claims herein."

 

Proceedings below

 Texas Logos filed this suit, accompanied by a motion for expedited discovery, on
December 11, 2006. A hearing was set on Texas Logos's request for temporary injunction for
December 18, 2006. That morning, the Media Choice Defendants filed a plea to the jurisdiction
urging that "this case must be dismissed" because (1) Texas Logos's suit sought "judicial review"
of TxDOT's logo sign contract award, and the legislature had not provided for such review; and
(2) TxDOT was an indispensable party who could not be joined. The injunction hearing was
postponed a day for reassignment. On the following morning, prior to the hearing, Brinkmeyer filed
a plea to the jurisdiction asserting that he was acting within his official capacity and was shielded
by official immunity.

 At the injunction hearing, the parties agreed to take up the jurisdictional issues before
addressing Texas Logos's request for injunctive relief. None of the parties introduced jurisdictional
evidence. Argument was focused on Texas Logos's request for injunctive relief, which the Media
Choice Defendants characterized as an attempt to "shut the [logo sign] program down." (5) Brinkmeyer
"adopt[ed] Media Choice's argument on jurisdiction also," but briefly argued his grounds. At the
conclusion of the hearing, the district court signed an order granting the Media Choice Defendants'
plea to the jurisdiction. Although the order otherwise referenced only the plea to the
jurisdiction filed by the Media Choice Defendants, (6) its concluding sentence stated, "IT IS
ORDERED Defendants' Plea to the Jurisdiction is GRANTED and this matter is dismissed for lack
of subject-matter jurisdiction." (Emphasis added.)

 Disputes soon arose regarding the scope of the dismissal order, and Texas Logos
filed a "motion to clarify" the ruling. Texas Logos urged that the Media Choice Defendants had
sought dismissal only of Texas Logos's injunctive and declaratory claims, not its tort damages
claims, and that the order had not, and could not have, dismissed its claims against the other
defendants. Texas Logos asked the district court "to confirm that it grants only the relief sought by
[the Media Choice Defendants'] Plea to the Jurisdiction and only as to the moving parties." 
The district court denied this motion. Texas Logos appeals from the district court's orders
dismissing "this matter" and denying its motion to clarify.


ANALYSIS Texas Logos brings three issues on appeal, arguing that the district court erred in
(1) granting the Media Choice Defendants' plea to the jurisdiction; (2) dismissing its claims against
Brinkmeyer; and (3) dismissing claims that it contends were not addressed in the Media Choice
Defendants' plea to the jurisdiction and granting relief as to defendants who did not file pleas to
the jurisdiction.


Media Choice Defendants

 At this juncture, Texas Logos "does not challenge the Court's decision that TxDOT
was indispensable to its claims for injunctive and declaratory relief," but limits its complaint to the
district court's dismissal of its common-law tort causes of action for monetary damages. These
claims, Texas Logos urges, do not seek "judicial review" of or seek to disturb TxDOT's logo sign
contract award to Media Choice, but to enforce long-established common-law rights against private
parties over which the district courts continue to possess subject-matter jurisdiction. Similarly,
Texas Logos argues that TxDOT is not an indispensable party to these claims.

 The Media Choice Defendants respond that Texas Logos's tort claims ultimately
require re-determination of which bidder's proposal offered "the best value for the state," "whether
TxDOT's procurement decision was correct or not," and the validity of that award. In their view,
"[s]eeking a ruling that the TxDOT procurement process was tainted by fraud, conspiracy, and
tortious acts is nothing more than a backdoor means of attacking the validity of the Logo Sign
procurement in an attempt to circumvent the fact that the court lacks jurisdiction to review TxDOT's
procurement decisions."

 Texas Logos replies that its tort damages claims do not require re-litigation of
whether its logo sign contract proposal provided "the best value to the state," but instead "would
merely require a jury to decide whether, in the absence of Appellee's . . . conduct, it is probable that
Texas Logos would have received the Logo Sign Contract." Even if these determinations overlap
somewhat, Texas Logos adds, there is nothing in the statutory scheme governing TxDOT's logo sign
procurement that manifests legislative intent to divest Texas courts of their subject-matter
jurisdiction to adjudicate such issues even when they arise in the context of common-law tort claims.
We agree with Texas Logos.

 We begin by observing that, at least at this juncture, Texas Logos does not seek to
set aside or declare invalid TxDOT's award of the logo sign contract to Media Choice. To the
contrary, its tort claims are predicated on the fact that TxDOT has made that award. Similarly, 
Texas Logos seeks no relief from TxDOT, only from private parties. Nor does Texas Logos now
seek to enjoin the performance of the logo sign contract, but requests only monetary damages.

 Although some of Texas Logos's factual allegations are capable of being construed
as attacks on TxDOT's procurement decision, Texas Logos's common-law tort theories ultimately
do not require "review" or re-litigation of the same issues TxDOT decided when awarding the logo
sign contract or the correctness of its award. By statute, TxDOT was required to award the logo sign
contract based on its determination of which proposal presented "the best value for the state,"
considering several enumerated factors. See Tex. Transp. Code Ann. § 391.091(c). What Texas
Logos must prove to recover damages resulting from the loss of the logo sign contract is not that its
proposal provided the best value for the state, per se, or that TxDOT's determination was "wrong"
based on the information it was provided, but that Texas Logos probably would have won the
contract but for the defendants' tortious conduct. (7) In these respects, Texas Logos is in a position
similar to legal-malpractice plaintiffs, who must prove what the outcome at the tribunal probably
would have been absent tortious conduct, not that the tribunal's decision was wrong on the record
before it. See Alexander v. Turtur & Assocs., 146 S.W.3d 113, 118 (Tex. 2004) (in legal malpractice
case, jury was charged with deciding whether, in reasonable probability, a bankruptcy judge would
have decided the underlying adversary proceeding differently, absent the alleged malpractice). Such
an inquiry is not considered a "review" of the tribunal's decision.

 Even if there is some overlap between the issues raised by Texas Logos's tort
damages claims and those TxDOT decided when awarding the logo sign contract, we cannot
conclude that the legislature intended to divest the district court of its subject-matter jurisdiction over
those claims. As the Media Choice Defendants acknowledged during oral argument, their
contentions that Texas Logos's common-law tort claims seek "judicial review" of TxDOT's
procurement decision ultimately amounts to an assertion that the legislature vested TxDOT with the
sole or exclusive jurisdiction to decide those issues--and correspondingly divested the judiciary of
its jurisdiction to decide them--even when those issues arise in the context of common-law tort
claims. See Texas Logos I, 241 S.W.3d at 116-17 (rejecting TxDOT's contention that Texas Logos's
declaratory claims sought "judicial review" of its procurement decision; explaining that district
court's subject-matter jurisdiction over declaratory claims "exists independently of any
administrative remedies," although "the subject matter of a UDJA claim . . . may sometimes be
subsumed within the agency's exclusive jurisdiction"). We find no support for that assertion.

 Our analytical starting point for determining whether a trial court or an administrative
agency has subject-matter jurisdiction over an issue in dispute is article V, section 8 of the
Texas Constitution. It provides that a district court's jurisdiction "consists of exclusive, appellate,
and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive,
appellate, or original jurisdiction may be conferred by this Constitution or other law on
some other court, tribunal, or administrative body." Tex. Const. art. V, § 8. The legislature has
provided by statute that district courts possess "the jurisdiction provided by Article V, Section 8,
of the Texas Constitution," and "may hear and determine any cause that is cognizable by courts of
law or equity and may grant any relief that could be granted by either courts of law or equity." 
Tex. Gov't Code Ann. §§ 24.007-.008 (West 2004). Thus, "[c]ourts of general jurisdiction
presumably have subject matter jurisdiction unless a contrary showing is made." Subaru of Am., Inc.
v. David McDavid Nissan, Inc., 84 S.W.3d 212, 220 (Tex. 2002).

 By contrast, "there is no presumption that administrative agencies are authorized to
resolve disputes. Rather, they may exercise only those powers the law, in clear and express statutory
language, confers upon them." Id. "Courts will not imply additional authority to agencies, nor may
agencies create for themselves any excess powers." Id. The courts are not divested by an agency
of the subject-matter jurisdiction they would otherwise possess to adjudicate a dispute unless the
legislature has granted the agency exclusive jurisdiction, or the sole power to make the initial
determination in the dispute. Id. at 221; Bexar Metro. Water Dist. v. City of Bulverde, 156 S.W.3d
79, 90 (Tex. App.--Austin 2004, pet. denied). Whether an agency has exclusive jurisdiction is
determined by construction of the relevant statutory scheme. See Thomas v. Long, 207 S.W.3d 334,
340 (Tex. 2006). Such jurisdiction may be reflected in either express statutory language to that
effect or the overall statutory scheme. Id. at 340-42.

 Statutory construction presents a question of law that we review de novo. State
v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). We seek to discern the legislature's intent, as
manifested first and foremost in the statutory text. Id. We ascertain the legislature's intent
from the plain meaning of the words chosen when possible. Id. To that end, we consider
statutory language in context, not in isolation. Jones v. Fowler, 969 S.W.2d 429, 432 (Tex. 1988);
see Tex. Gov't Code Ann. § 311.011(a) (West 2005). We also presume that the legislature acted
with knowledge of the background law. Acker v. Texas Water Comm'n, 790 S.W.2d 299,
301 (Tex. 1990). When ascertaining legislative intent, we may also consider the objective of the law,
its history, and the consequences of a particular construction. Tex. Gov't Code Ann. § 311.011(b);
see also id. § 311.023(1), (3), (5) (West 2005).

 We further observe that the types of claims Texas Logos asserts--causes of action
for damages arising from fraud, tortious interference with an existing contract, and civil
conspiracy--are deeply rooted in Texas common law. See Williams v. Khalaf, 802 S.W.2d 651,
655 (Tex. 1990) (discussing the common law development of fraud in Texas); Wal-Mart Stores, Inc.
v. Sturges, 52 S.W.3d 711, 721 (Tex. 2001) (discussing the history and development of tortious
interference law in Texas); Juhl v. Airington, 936 S.W.2d 640, 644 (Tex. 1996) (noting that common
law civil conspiracy, has been "long a recognized tort in this state"). Texas courts have also
recognized that such claims may arise from a private party's torts while inducing governmental
action. See generally Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 926-27 (Tex. 1993)
(recognizing existence of tortious-interference claim between competing state contractors);
Texas Disp. Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc., 219 S.W.3d 563 (Tex. App.--Austin
2007, pet. denied) (discussing tort claims asserted by business against its competitor arising from
municipal actions induced by competitor's communications); cf. RRR Farms v. American Horse
Prot. Ass'n, 957 S.W.2d 121, 126-31 (Tex. App.--Houston [14th Dist.] 1997, pet. denied)
(discussing affirmative defense under the Noerr-Pennington doctrine). These considerations inform
our analysis of the statutory framework governing TxDOT's logo sign procurement process. 
Specifically, because statutory repeal or abrogation of common-law claims implicates open-courts
concerns, it is "disfavored" and the statute may be so interpreted only when its express terms or
necessary implications clearly indicate the legislature's intent to take those actions. Cash Am. Int'l
v. Bennett, 35 S.W.3d 12, 16 (Tex. 2000); see Tex. Const. art. I, § 13.

 There is no clear legislative intent in the statutory scheme governing TxDOT's
procurement of the logo sign contract to divest Texas courts of their subject-matter jurisdiction over
the types of common-law claims Texas Logos asserts. The legislature certainly did not state any
such intent. Cf. Subaru, 84 S.W.3d at 219, 223 (construing motor vehicle code, which delegated to
motor vehicle board "exclusive, original jurisdiction to regulate those aspects of the distribution, sale
and leasing of motor vehicles as governed by this Act," to create a "hybrid claims-resolution
process" under which code-interpretation issues raised by common-law claims must first be
adjudicated by the board). Nor is any such intent implicit in the statutory scheme as a whole. The
legislature delegated to TxDOT authority to determine the narrow question of which vendor's logo
sign proposal was the best based on statutory criteria. Beyond this, it did not empower TxDOT to
regulate the conduct of private vendors, much less supplant the rights and duties those vendors or
other private parties owe each other under the common law. Cf. American Motorists Ins. Co.
v. Fodge, 63 S.W.3d 801, 803-04 (Tex. 2001) (where legislature has made recovery of workers'
compensation benefits the "exclusive remedy" of covered employees and their beneficiaries,
plaintiff's tort claim for wrongful deprivation of such benefits required prior agency ruling that
worker was entitled to such benefits); Texas Court Reporters Cert. Bd. v. Esquire Depo. Servs.,
L.L.C., 240 S.W.3d 79, 89-90 (Tex. App.--Austin 2007, no pet.) (discussing certification board's
exclusive jurisdiction to make disciplinary determinations within comprehensive statutory scheme
to regulate court reporters). And, again, Texas Logos's claims do not seek to invalidate the logo sign
contract or obtain any other remedy that the legislature has vested in TxDOT. Compare Fodge,
63 S.W.3d at 803-04 (tort claim for wrongful deprivation of workers' compensation benefits
implicated decision within the agency's exclusive jurisdiction to award such benefits) with
Texas Mut. Ins. Co. v. Texas Dep't of Ins., Div'n of Workers' Comp., 214 S.W.3d 613, 616-21
(Tex. App.--Austin 2006, no pet.) (distinguishing Fodge and holding that mere fact that coverage
issue presented by common-law claim paralleled potential coverage issues within division's
exclusive jurisdiction to determine did not divest district court of its subject-matter jurisdiction over
the common-law claim).

 This Court's decision in Austin Chevrolet, Inc. v. Motor Vehicle Board is also
instructive. 212 S.W.3d 425 (Tex. App.--Austin 2006, pet. denied). In 1993, a car dealer filed a
license application with the motor vehicle board for a new General Motors dealership. A competing
dealer filed a protest. The competitor ultimately withdrew the protest based on what it claims were
assurances from GM that it would address the dealer's concerns, and the new dealership went
forward. A few years later, additional disputes arose and the protesting dealer filed suit in district
court alleging that GM had defrauded it out of its right to protest the 1993 license application,
causing it damages related to the dealership's approval. In an attempt to follow the supreme court's
directives in Subaru, the district court abated the suit and referred to the board the issue of whether
the board would have denied the license if the protest had not been withdrawn. See id. at 429. While
recognizing the board's expansive exclusive jurisdiction to decide code-based issues even when
arising in common-law claims, we held that this jurisdiction did not extend to deciding what the
board would have decided in 1993 if the protesting dealer had not been induced to abandon its
protest. See id. at 431-32 ("although the Board has expertise and experience in making the good
cause determination in protest proceedings and has developed rules and procedures for those
proceedings, it has no expertise, experience, or rules relevant to a determination of how Board
members sitting in the past would have reasoned or ruled, or in determining what evidence,
witnesses, and theories the parties might have proffered in a past proceeding."). We similarly
conclude here that whatever authority the legislature delegated to TxDOT to determine the best value
for the state in awarding the logo sign contract is not implicated or infringed by Texas Logos's tort
damages claims, which turn on what the agency probably would have decided absent the defendants'
alleged tortious conduct.

 The Media Choice Defendants ultimately rely on what they term "sound public
policy," urging that "claims for damages against private parties are just as harmful to the finality of
the procurement process as its claims for injunctive and declaratory relief" because the prospect of
"protracted litigation brought by unsuccessful bidders" would cause "the validity of . . . contract
awards [to] remain uncertain" and make "[t]he business of the State . . . grind to a halt." They add
that they or potential TxDOT employee-witnesses would be "distracted as a result of litigation
from a disgruntled bidder" and "private interests would be less willing to participate i[f]
State competitive bidding processes exposed them to civil suits." Whatever merit these policy
concerns might have, we have concluded that the legislature has thus far not acted to address them
by divesting the Texas judiciary of its subject-matter jurisdiction over the types of common-law
damages claims Texas Logos asserts. We also agree with Texas Logos's observations that the
jurisdictional limitations the Media Choice Defendants advocate amount to an extension of
TxDOT's sovereign immunity to shield its vendors, as well as any agency employees who might be
witnesses in litigation between private parties. There is no support in Texas law for such an
expansive application of sovereign immunity.

 In sum, we agree with Texas Logos that the legislature has not divested the
district court of its subject-matter jurisdiction to adjudicate Texas Logos's common-law tort
claims for damages. We similarly conclude that because Texas Logos no longer seeks any
injunctive or declaratory relief, TxDOT is not an indispensable party. Cf. Texas River Barges
v. City of San Antonio, 21 S.W.3d 347, 357 (Tex. App.--San Antonio 2000, pet. denied) (party to
a contract "is an indispensable party to any litigation that seeks to declare the contract void")
(emphasis added); McCharen v. Bailey, 87 S.W.2d 284, 285 (Tex. Civ. App.--Eastland 1935,
no writ) ("Where the injunction in effect sets aside a contract all parties to the contract are necessary
parties."). We conclude that the district court erred in granting the Media Choice Defendants' plea
to the jurisdiction as to Texas Logos's common-law tort claims for damages.


Other defendants

 Of the remaining defendants, only Brinkmeyer asserts any additional legal theory
under which the district court could have dismissed Texas Logos's claims against them for want of
subject-matter jurisdiction. Brinkmeyer, as well as Centerline, have merely incorporated or adopted
the Media Choice Defendants' jurisdictional arguments, (8) while Brinkmeyer's consulting firm,
Hori-Zone, has not filed a brief.

 Brinkmeyer, as noted, filed a plea to the jurisdiction below, and he brings those
grounds for dismissal forward on appeal in support of the district court's dismissal of Texas Logos's
claims against him. Brinkmeyer argues that (1) he is shielded by sovereign immunity "because
complaints of his actions as a governmental official may be complaints against him in his official
capacity, and thus a suit against the State"; and (2) Texas Logos has pled only acts for which he
possesses official immunity and "official immunity is immunity from suit, which makes it
jurisdictional and analogous to sovereign immunity." At oral argument, Brinkmeyer acknowledged
that his notion that the affirmative defense of official immunity is jurisdictional rather than a plea
in bar represents an extension of current Texas law on the subject, although one that he urges is "not
that much of a stretch." See City of Lancaster v. Chambers, 883 S.W.3d 650, 653 (Tex. 1994)
("Government employees are entitled to official immunity from suit . . . ."); but see Texas A&M
Univ. Sys. v. Koseoglu, 233 S.W.3d 835, 843 (Tex. 2007) (observing that section 51.14(a) of the civil
practice and remedies code reflects that "an official sued in his individual capacity would assert
official immunity as a defense to personal monetary liability, which is well suited for resolution in
a motion for summary judgment . . . [b]ut an official sued in his official capacity would assert
sovereign immunity."). We need not reach that question, however, because any assertions that
Texas Logos has pled only acts shielded by Brinkmeyer's official immunity or within his official
capacity are without merit. See id. (official immunity applies to acts within a governmental
employee's "performance of their (1) discretionary duties in (2) good faith as long as they are
(3) acting within the scope of their authority."); see also Miranda, 133 S.W.3d at 226 (we construe
pleadings liberally, looking to the pleader's intent, and pled jurisdictional facts are presumed true
unless conclusively negated with jurisdictional evidence). Accordingly, the district court would have
erred in dismissing Texas Logos's claims against Brinkmeyer on these grounds.

 For these reasons, our analysis of the Media Choice Defendants' arguments requires
reversal of the district court's order or orders dismissing Texas Logos's monetary damages claims
as to all six defendants. As this is the entirety of the relief Texas Logos seeks in this appeal, we need
not reach its issue complaining that the district court erred in granting relief beyond the scope of the
Media Choice Defendants' plea to the jurisdiction. (9) See Tex. R. App. P. 47.1.


CONCLUSION

 We reverse the district court's judgment dismissing Texas Logos's common-law tort
damages claims for want of subject-matter jurisdiction, and remand for further proceedings
consistent with this opinion.



 ____________________________________________

 Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Reversed and Remanded

Filed: May 7, 2008
1. See generally Texas Logos, L.P. v. Texas Dep't of Transp., 241 S.W.3d 105, 108-09
(Tex. App.--Austin 2007, no pet.) (Texas Logos I) (describing TxDOT's logo sign program).
2. We discussed these statutes in Texas Logos I. See generally Texas Logos I, 241 S.W.3d
at 108-09, 110-11, 116-19.
3. Because we are required here to assume the truth of the factual allegations contained in
Texas Logos's pleadings, Miranda, 133 S.W.3d at 226, we intend no comment regarding the validity
or accuracy of the pled facts we summarize below, as that issue is not before us.
4. See Tex. Civ. Prac. & Rem. Code Ann. § 37.004 (West Supp. 2007). Texas Logos also
sought attorney's fees. Id. § 37.009 (West 1997).
5. The following exchange occurred in regard to the nature of Texas Logos's claims: 


The Court: When I asked the question what he wants the Court to do, he didn't
say anything about interrupting the trans[action], he just wanted to
make sure that you didn't make any profit. Isn't that what he said?


Counsel for the Media Choice Defendants: Your Honor, I'm not sure that's
exactly what he said. What their
pleadings say - 


The Court: Enjoin you from profiting off of this fraudulent activity.



Counsel: Well, I think what their pleadings say and I believe what they're
requesting in their pleading is the Court enjoin us from taking any
steps to perform under this contract, not to profit under the contract. 
Now, if there was jurisdiction, we could fashion a remedy that would
be satisfactory that would say well you know, if we profit from it,
that's an adequate remedy of law. There are damages and it's their
right at the end of the day and we caused them some damage, a check
can be written and that's the end of the story. That doesn't require
injunctive relief. But that's not what they're asking for, Your Honor,
and I need to be clear on that. What they want to do is they want to
shut this program down. They don't want us to perform on it and
they don't want Tex DOT to allow us to perform. . . . 
6. The order was titled, "Order Granting Defendants LoneStar Logos & Signs, LLC,
MediaChoice, LLC. and Quorum Media Group, LLC's Plea to the Jurisdiction."
7. Based on the pleadings, the principal component of Texas Logos's alleged damages is the
loss of the logo sign contract. Similarly, Texas Logos pled, in regard to its tortious interference
cause of action," that "But for the Defendants' afore-mentioned tortious and illegal actions, a
reasonable probability existed that TxDOT would have awarded the Logo Sign Contract to Plaintiff
TEXAS LOGOS and TEXAS LOGOS would have entered into that Contract," and "Defendants'
independently tortious or unlawful acts were a direct and proximate cause in preventing TxDOT and
Plaintiff TEXAS LOGOS from entering into the afore-mentioned contractual relationship." 
See Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc., 219 S.W.3d 563, 590
(Tex. App.--Austin 2007, pet. denied) (to prove tortious interference with prospective contract
plaintiff must establish, among other things, "a reasonable probability that the parties would have
entered into a business relationship . . . and actual harm or damages suffered by the plaintiff as a
result of the defendant's interference, i.e., that the defendant's actions prevented the relationship
from occurring).
8. Although its brief is otherwise consistent with that of the Media Choice Defendants,
Centerline omits the argument that TxDOT is an indispensable party.
9. See Hendee I, 228 S.W.3d at 375 (acknowledging that while jurisdictional issues generally
can be raised sua sponte or on appeal, procedural limitations may come into play that render
dismissal on sovereign immunity grounds erroneous or an abuse of discretion).